## In re SUPERIOR USED CARS, INC., Debtor.

**First Bank, Upper Michigan, Plaintiff,**

**v.**

**North Country Bank & Trust, Defendant.**

**Bankruptcy No. GM 96–90042.**

**Adversary No. 99–99055.**

United States Bankruptcy Court, W.D. Michigan.

Feb. 9, 2001.

Kevin M. Zielke, Dykema Gossett, PLLC, Detroit, Michigan, for plaintiff First Bank Upper Michigan.

Michael S. McElwee, Varnum, Riddering, Schmidt & Howlett, LLP, Kalamazoo, Michigan, for defendant North Country Bank & Trust.

## OPINION REGARDING CROSS–MOTIONS FOR SUMMARY JUDGMENT

JAMES D. GREGG, Chief Judge.

### I. ISSUES

In its Fourth Amended Complaint, Plaintiff First Bank, Upper Michigan ("First Bank") seeks four remedies:

1) A declaratory judgment that First Bank is the first-priority lienholder in Superior Used Car, Inc.'s ("Debtor") prepetition personal property and all cash and noncash proceeds from the sale of these assets;

2) Creation of a constructive trust for all proceeds from the sales of the Debtor's prepetition assets, which were received by Defendant North Country Bank & Trust ("North Country") on or after January 13, 1989;

3) Amendment of the Debtor's Second Amended Plan to reflect the outcome of this litigation; and

4) Subordination of North Country's claims under 11 U.S.C. § 510(c).

The prepetition assets referenced in the first request for relief have been liquidated. See Memorandum of Law in Support of North Country's Motion for Summary Judgment at 3. Therefore, the first two claims concern the entitlement to the proceeds from the sales of prepetition assets. In resolving these claims, the court must consider two issues. First, to which proceeds is First Bank entitled? Second, did North Country receive any of these proceeds, and, if so, is First Bank entitled to the imposition of a constructive trust? An important subissue is which party bears the burden of proof to identify the proceeds of the sales of the Debtor's prepetition inventory.

The third issue raised in the complaint is whether the court may modify the Debtor's confirmed chapter 11 plan to reflect the outcome of this litigation.

The fourth issue raised in the complaint is whether First Bank is entitled to equitably subordinate North Country's claims under 11 U.S.C. § 510(c).[1]

Although not in its amended complaint, First Bank raises another issue in its pleadings and supporting legal memoranda: whether the court should deny North Country super-priority status under § 364, based on North Country's failure to obtain court approval for its postpetition lending relationship with the Debtor. In resolving the § 364 issue, the court must address two subissues: whether First Bank can request this remedy after plan confirmation; and whether First Bank now has standing to challenge North Country's postpetition dealings with the Debtor.

### II. JURISDICTION

This court has jurisdiction to hear this case under 28 U.S.C. § 1334. In accordance with 28 U.S.C. § 157(a) and L.R. 83.2(a) (W.D.Mich.), this bankruptcy case and all related proceedings have been referred to this court. This adversary proceeding is a core proceeding to determine, among other things, the priority of various liens held by First Bank and North Country in the assets of the Debtor. See 28 U.S.C. § 157(b)(2)(A), (B), (K). To the extent that this is not a core proceeding, both parties have consented to this court entering a final judgment. This court has

---

1. The Bankruptcy Code is set forth in 11 U.S.C. §§ 101–1330. Unless stated otherwise, all future statutory references are to the Bankruptcy Code, e.g., "§ _____."

the authority to enter a final judgment in this matter. 28 U.S.C. § 157(b)(1), (c)(2).

der Re North Country Bank's Motion to Separate Claims.[2]

## III. PROCEDURAL HISTORY

This action was initially commenced in the State of Michigan, Circuit Court for the County of Delta, to determine the priority of liens on the Debtor's inventory, held by First Bank, North Country, Whirlpool Financial Corp., Peninsula Bank, Deutsche Financial Services Corp. and State Bank of Escanaba. After the litigation commenced in the state court, the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code. The Debtor then stipulated to modify the automatic stay, *see* § 362, to allow the state court proceeding to go forward.

In the state court action, Peninsula Bank filed a cross-claim to foreclose its mortgage on the real property of the Debtor. Because the Internal Revenue Service held tax liens on the real property, the United States of America was added as a party. The United States then removed the state court action to the United States District Court for the Western District of Michigan. Peninsula Bank's claim against the real property was satisfactorily dealt with in the Debtor's chapter 11 plan of reorganization. As a result, Peninsula dismissed its foreclosure claim, dropping the United States as a party to the district court litigation. At that point, the parties stipulated to remove the litigation to this court.

North Country then filed a motion to separate itself in this adversary proceeding from Peninsula Bank and State Bank of Escanaba, claiming that its legal position was different than that of the other two defendant banks. First Bank consented to this motion, and on November 17, 1999, the court signed the Stipulated Or-

## IV. UNCONTESTED FACTS

First Bank loaned the Debtor $300,000 on December 30, 1988. This loan was secured by the new and used inventory "now owned or hereafter acquired" by the Debtor. First Bank Exhibit 1. First Bank originally perfected its security interest by filing a financing statement with the Michigan Secretary of State on January 13, 1989. First Bank Exhibit 2. On January 17, 1991, by filing another financing statement, First Bank took a blanket security interest in the Debtor's personal property. First Bank Exhibit 2. First Bank maintained the perfection of its security interest by filing continuation statements on December 6, 1993 and December 21, 1995. First Bank Exhibits 2 and 3. On August 31, 1995, the original loan was renewed. First Bank Exhibit 1. As of October 19, 2000, the amount owed by the Debtor to First Bank was $463,639.75. First Bank, Upper Michigan's Brief in Support of Motion For Summary Judgment at 3.

North Country became involved in April 1991, when it began loaning funds to the Debtor. First Bank Exhibit 4. The loans were secured by real estate and specific items of inventory. First Bank Exhibits 4–18. On April 15, 1991, North Country perfected its security interest by filing a financing statement covering all non-inventory assets of the Debtor. First Bank Exhibit 20. This financing statement was continued on February 5, 1996. First Bank Exhibit 21.

At some point prior to 1996, the Debtor defaulted on its loan obligations. After default, First Bank instituted legal action to recover proceeds from the sale of the Debtor's inventory allegedly paid to junior

---

**2.** Whirlpool Financial was dismissed as a defendant on August 26, 1996, when First Bank purchased its interest and became the first-priority lien holder in the Debtor's inventory. Deutsche Financial Services was also dis-

missed as a defendant at some point in the litigation, leaving North Country, Peninsula Bank and State Bank of Escanaba as the remaining defendants.

creditors.[3]   On February 2, 1996, while this action was pending, the Debtor commenced its chapter 11 case.   Docket No. 1.

Also on February 2, 1996, North Country greatly expanded its business relationship with the Debtor.   North Country loaned the Debtor $200,000 and received a purchase money security interest in the Debtor's postpetition inventory.   First Bank Exhibits 22 and 23.   On February 13, 1996, North Country perfected its purchase money security interest by filing a financing statement that covered "inventory which [the Debtor] holds for ultimate sale or lease which has been purchased with funds advanced by the Secured Party [North Country]."   First Bank Exhibit 23.

North Country's postpetition relationship with the Debtor continued to grow. On March 25, 1996, North Country filed another financing statement, this time disclosing an interest in recreational vehicles that were consigned to the Debtor.   First Bank Exhibit 26.   On April 12, 1996, North Country consolidated fifteen of its prepetition loans to the Debtor into three loans totaling $529,836.90.   First Bank Exhibits 28–30.   These three loans were further consolidated into one loan representing all unpaid prepetition debt on October 20, 1997.   First Bank Exhibits 32 and 33.

On July 11, 1996, North Country loaned the Debtor $32,620.92 to purchase six (6) Skamper trailers.   First Bank Exhibit 27. North Country expanded its security interest to cover all *postpetition* assets of the Debtor on July 15, 1996.   First Bank Exhibit 24.   An amendment to the February 2 financing statement reflecting this change was filed on July 23, 1996.   First Bank Exhibit 25.

On December 2, 1997, this court confirmed the Debtor's Second Amended Plan. Docket No. 154.

**3.** Neither party submitted a copy of First Bank's initial state court complaint. However, North Country Exhibit A, Second Amended Complaint, bears a 1995 case number.

## V.   CONTESTED FACTS

There is one disputed material fact. Both First Bank and North Country claim to be entitled to proceeds from the sale of the six Skamper trailers, a Chevrolet 400 and an EZ Sportsman ("disputed collateral").   The disputed collateral is described as:

| | | |
|---|---|---|
| 1. | 1990 Chevrolet 400 | 1GCDK14Z5LE113279 |
| 2. | 1993 Skamper | 1SK22K243P2407278 |
| 3. | 1995 Skamper | 1SK79C803S0801444 |
| 4. | 1996 Skamper | 1SK22M285T2808243 |
| 5. | EZ Sportsman | 4EZTS2029SS03788 |
| 6. | 1994 Skamper | 1SK79B655S0651216 |
| 7. | 1993 Skamper | 1SK11E195R19C1442 |
| 8. | 1993 Skamper | 1SK22J200R2057330 |

North Country claims the Debtor purchased the six Skamper trailers from Whirlpool postpetition, before First Bank acquired Whirlpool's interest.   Likewise, North Country claims that the Debtor purchased the Chevrolet 400 and the EZ Sportsman postpetition with money advanced by North Country.   As a result, it asserts First Bank had no lien on the disputed collateral and is not entitled to the proceeds from the sales.[4]

First Bank claims that the disputed collateral was purchased by the Debtor prepetition.   Therefore, its blanket security interest covers the disputed collateral, and First Bank is entitled to the proceeds of the sales.

## VI.   DISCUSSION

### A.   Standards for Summary Judgment.

Federal Rule of Bankruptcy Procedure 7056 incorporates by reference Federal Rule of Civil Procedure 56.   That rule provides in part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

**4.** During argument, First Bank conceded it advanced no funds to the Debtor postpetition.

moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c).

Both the United States Supreme Court and the United States Court of Appeals for the Sixth Circuit have encouraged the use of summary judgment when appropriate. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Historic Preservation Guild v. Burnley,* 896 F.2d 985 (6th Cir.1989). These courts have noted that summary judgment may be an "appropriate avenue for the 'just, speedy and inexpensive determination' of a matter." *Cloverdale Equipment Co. v. Simon Aerials, Inc.,* 869 F.2d 934, 937 (6th Cir. 1989) (*quoting Celotex,* 477 U.S. at 327, 106 S.Ct. 2548).

The party moving for summary judgment bears the initial responsibility of informing the court of the basis of its motion and identifying those portions of the record which demonstrate the absence of a material issue of fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. Once the moving party has met its initial burden, the non-moving party must come forward with *specific facts* showing that there is a genuine issue of material fact on which the non-moving party will bear the burden of proof at trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 322–24, 106 S.Ct. 2548. If after adequate discovery the party bearing the burden of proof fails to make a showing sufficient to establish an essential element of his claim, summary judgment is appropriate. *Id.*

A motion for summary judgment requires the court to view "inferences to be drawn from the underlying facts . . . in the light most favorable to the party opposing the motion." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). On the other hand, the opponent has the burden to show that a "rational trier of fact [could] find for the non-moving party [or] that there is a 'genuine issue for trial.' " *His-*

*toric Preservation,* 896 F.2d at 993 (*quoting Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348). No genuine issue of material fact exists unless, in viewing the evidence in favor of the non-moving party, a reasonable fact finder could return a verdict for that party. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249, 106 S.Ct. 2505 (citations omitted). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient." *Id.* at 252, 106 S.Ct. 2505. The non-moving party is required to do more than simply show that there is some "metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. "Mere allegations are insufficient. The party with the burden of proof must provide concrete evidence in support of a claim and thereby demonstrate the existence of a genuine issue of material fact." *Cloverdale,* 869 F.2d at 937.

*B. To Which Proceeds Is First Bank Entitled?*

█ The first remedy sought by First Bank is a declaratory judgment that it is the first-priority lienholder in the Debtor's new and used inventory, used automobile inventory, chattel paper, instruments, documents, accounts, general intangibles, contract rights and security agreements, and all cash and noncash proceeds from the sale of these prepetition assets. Since the prepetition assets have been liquidated, the only issue is the entitlement to the proceeds from the disposition of those assets.

First Bank alleges that it holds a first priority secured status as to the cash and noncash proceeds received from the sale of its prepetition collateral. Under 11 U.S.C. § 552(b)(1), a security agreement entered into prior to filing bankruptcy continues after filing "to the extent provided by such security agreement and by applicable non-bankruptcy law." The UCC, as adopted in

Michigan, is the relevant nonbankruptcy law. According to Mich.Comp.Laws Ann. 440 .9306(2), a perfected security interest continues in proceeds. Mich.Comp.Laws Ann. 440.9306(3)(b) adds an additional requirement—if the secured party is claiming a security interest in cash proceeds, the proceeds must be identifiable. Read together, these sections mandate that First Bank's prepetition security interest continues in any cash proceeds that First Bank can identify as resulting from the disposition of its collateral.

North Country has offered no evidence disputing this claim. Per its loan documents, First Bank is the first-priority secured party in all of the Debtor's prepetition personal property and any noncash or identifiable cash proceeds of that property. First Bank is entitled to summary judgment as to its first requested declaratory relief. However, First Bank's security interest in any cash proceeds is limited to those proceeds that can be traced to the sale of the Debtor's prepetition personalty.

*C. Did North Country Receive Proceeds That First Bank Was Entitled To, And, If So, Is First Bank Entitled To The Imposition Of A Constructive Trust?*

■ The imposition and coverage of a constructive trust are determined by applicable state law. *Jaffke v. Dunham,* 352 U.S. 280, 77 S.Ct. 307, 1 L.Ed.2d 314 (1957). *See, Clemens v. Clemens,* 472 F.2d 939 (6th Cir.1972); *McTevia v. Adamo (In re Atlantic Mortgage Corp.),* 69 B.R. 321 (Bankr.E.D.Mich.1987). "Under Michigan law, a constructive trust can be imposed in circumstances of misrepresentation, concealment, mistake, undue influence, breach of fiduciary or confidential relationship, or fraud, among others." *McTevia v. Adamo,* 69 B.R. at 326. Other grounds justifying the imposition of a constructive trust include constructive fraud, duress, taking advantage of weakness, questionable means, and accident. *Id.* (citing *Potter v. Lindsay,* 337 Mich. 404, 411, 60 N.W.2d

133 (1953)). Finally, Judge Nims of this court has held that a constructive trust may be used when property, while not necessarily wrongfully acquired, is unconscionably withheld. *Omaha National Bank v. T & T Parts Warehouse, Inc. (In re T & T Parts Warehouse, Inc.),* 39 B.R. 399, 402 (Bankr.W.D.Mich.1984) (citing *Kent v. Klein,* 352 Mich. 652, 657, 91 N.W.2d 11 (1958)).

If North Country received proceeds from the Debtor that can be traced to the sale of First Bank's collateral, First Bank is entitled to the imposition of a constructive trust against North Country. Before awarding this remedy, though, the court must address the underlying issue: did North Country receive proceeds that can be traced to the sales of collateral in which First Bank had a first-priority secured interest? The major question to resolve this issue is which party has the burden of tracing the sales proceeds.

■ It is a well-established principle of law that the burden of proof is generally upon the party asserting the affirmative of an issue. *Rex Paper Co. v. Reichhold Chemicals, Inc.,* 252 F.Supp. 314 (W.D.Mich.1966); *Livingston Shirt Corp. v. Great Lakes Garment Manufacturing Co.,* 351 Mich. 123, 129, 88 N.W.2d 614 (1958) (citing *People v. Swineford,* 77 Mich. 573, 582, 43 N.W. 929 (1889)); *Saari v. George C. Dates & Assoc.,* 311 Mich. 624, 19 N.W.2d 121 (1945) (citing *People v. Swineford,* 77 Mich. at 582, 43 N.W. 929); *Wildey v. Crane,* 69 Mich. 17, 36 N.W. 734 (1888). Consonant with that reasoning, a party claiming a security interest in proceeds under Michigan state law bears the burden of identifying and tracing the proceeds. *Conagra, Inc. v. Farmers State Bank,* 237 Mich.App. 109, 602 N.W.2d 390, 399 (1999) (citing Hawkland, Lord & Lewis, *Uniform Commercial Code Series,* § 9–306:3, pp. 39–41 (1997)). See, *Maxl Sales Co. v. Critiques, Inc.,* 796 F.2d 1293 (10th Cir.1986); *Sher v. Ford Motor Credit Co. (Matter of Sherwood Ford, Inc.),* 1992 WL 295951 (D.Md.1992); *C.O. Funk & Sons,*

*Inc. v. Sullivan Equipment, Inc.,* 89 Ill.2d 27, 59 Ill.Dec. 85, 431 N.E.2d 370, 373 (1982). *See also* James J. White & Robert B. Summers, *Uniform Commercial Code,* § 32–10 at 298 (4th ed.1995).

In this adversary proceeding, First Bank is alleging that North Country has received and wrongfully withheld proceeds from the sale of collateral in which First Bank was the first-priority lienholder. As the party who "would be defeated if no proof were offered", the onus of proof is on First Bank. *Livingston Shirt,* 351 Mich. at 129, 88 N.W.2d 614. It must prove the affirmative: that North Country received these proceeds. To place the burden on North Country would force North Country to prove a negative: that it did not receive proceeds to which First Bank was entitled.

First Bank argues that the court should nevertheless reallocate this burden to North Country, citing *Fireman's Fund Ins., Cos. v. Ex–Cell–O Corp.,* 702 F.Supp. 1317 (E.D.Mich.1988), for the proposition that the court should consider fairness when allocating the burden of proof. First Bank's reliance on that case is misplaced, as it is factually and legally distinguishable from the uncontested facts in this adversary proceeding.

In *Fireman's Fund,* the insured's insurance policy excluded payment for damages resulting from pollution, with the exception of damages resulting from "sudden and accidental discharge." The court held that the burden of production of evidence that the damages fit within the exception to the pollution exclusion was on the insured, since the insured could more easily produce the evidence. *Id.* at 1328. In reaching this conclusion, the court reasoned that it would "impose an undue burden on [the insurer] to require it to ferret out evidence of [the insured's] sudden and accidental discharge of pollutants.... [The insured] can more easily produce this evidence." *Id.*

In this adversary proceeding, First Bank is *not* arguing that North Country should have to "ferret out" evidence from

North Country's records about North Country's activities. Rather, First Bank asserts that North Country should carry the burden of discovering evidence from the financial records of a third party (the Debtor), about the Debtor's activities.

In addition to forcing North Country to monitor and investigate the financial records of the Debtor, shifting the burden of proof to North Country would in essence place the burden of policing First Bank's collateral upon North Country. It would also place the risk of loss due to the Debtor's inadequate record-keeping (or sales out of trust) squarely on North Country, effectively requiring North Country to insure First Bank against losses of collateral. Such an outcome is neither fair nor equitable. The court believes that the much better reasoned approach is for each party to bear the responsibility of monitoring its own collateral. The burden of tracing the proceeds from the sales of the Debtor's prepetition inventory therefore remains with First Bank.

First Bank admitted in oral argument, as well as in its Brief in Response to North Country's Motion for Summary Judgment, that it cannot meet this burden. Both parties have engaged in extensive discovery, and this case was commenced nearly five years ago. It is now impossible for First Bank to establish that is entitled to the imposition of constructive trust. No cogent evidence exists to show that North Country received any sales proceeds from First Bank's prepetition collateral. Therefore, North Country is entitled to summary judgment which denies First Bank's request for the imposition of a constructive trust.

The court recognizes an exception to the granting of summary judgment to North Country regarding this claim. There remains a material factual dispute regarding the proceeds from the sale of the disputed collateral. First Bank claims that the disputed collateral was purchased prepetition, and is thus covered by its perfected securi-

ty agreement. First Bank's collateral list contains the disputed collateral. North Country claims that the disputed collateral was purchased postpetition, and therefore is covered by its security interest. Neither party has disclosed sufficient evidence for the court to determine when the disputed collateral was purchased by the Debtor. Therefore, summary judgment is inappropriate regarding the parties' claims to the proceeds from the sale of the disputed collateral.

### D. Modification of the Debtor's Confirmed Chapter 11 Plan

First Bank requests that the Debtor's confirmed chapter 11 plan be modified to reflect the outcome of this litigation. Section 1127(b) of the Bankruptcy Code allows postconfirmation modification by the proponent of the plan or the reorganized debtor, if the modification occurs prior to "substantial consummation." First Bank is not entitled to relief under § 1127(b) for two reasons.

First and foremost, there has already been "substantial consummation." § 1101(2). All parties have been performing under the terms of the plan for over two years. The court does not believe that at this late date it is legally permissible to modify the confirmed chapter 11 plan. Second, even if the plan has not already been substantially consummated, granting First Bank's requested modification of the plan is improper. First Bank, a creditor, is neither the reorganized debtor nor the proponent of the plan. Therefore, § 1127(b) does not give it authority to seek modification of the Debtor's confirmed chapter 11 plan.

First Bank argues that Article VI of the confirmed chapter 11 plan allows the requested modification of the plan.[5] The court will interpret Article VI as permitting the parties to determine their respective priorities in the Debtor's prepetition collateral, notwithstanding plan confirmation. Plan modification is not necessary to effectuate this intent. A judgment determining the outcome of this adversary proceeding is necessary and proper, not a modification of the confirmed chapter 11 plan. Federal Rule of Bankruptcy Procedure 9021, which incorporates. Fed. R.Civ.P. 54(b), authorizes this court to enter a binding judgment. In this adversary proceeding, the court may grant any of First Bank's requested remedies without modifying the confirmed chapter 11 plan.

Because modification of the Debtor's confirmed chapter 11 plan is neither legally permissible nor necessary, North Country is entitled to summary judgment as to First Bank's request to modify the Debtor's confirmed chapter 11 plan.

### E. Equitable Subordination.

First Bank requests that North Country's claims be equitably subordinated under § 510(c) of the Bankruptcy Code and asserts that North Country's postpetition lending relationship with the Debtor is defective because no bankruptcy court order was entered as required by § 364. Both claims are barred by res judicata.

The concept of equitable subordination developed as a defense to the allowance of claims. Andrew DeNatale and Prudence B. Abram, *The Doctrine of Equitable Subordination as Nonmanagement Creditors*, 40 Bus.Law. 417 (1985) (citing *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939)). It remained a common law doctrine until the adoption of

---

5. Article VI of the Second Amended Plan of Reorganization states in relevant part that: [T]here is litigation presently pending involving the priorities of First Bank [and] North Country Bank ... in certain collateral owned by the Debtor. The outcome of this litigation may effect [sic] the rights of these creditors in this collateral and may therefore effect [sic] the payments which ... these creditors may be entitled to receive and required interest thereon.... If the conclusion of the litigation requires the Debtor to amend the Plan, it will do so at that time pursuant to the provisions of this paragraph.

the Bankruptcy Code. Congress deferred to the common law in defining the "principles of equitable subordination" in § 510(c). *United States v. Noland,* 517 U.S. 535, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996). In a leading case, the Fifth Circuit defined three conditions to justify equitable subordination:

1) The claimant must have engaged in inequitable conduct;

2) The misconduct must have resulted in injury to the creditors or given the claimant an unfair advantage; and

3) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy [Code].

*In the Matter of Mobile Steel Co.,* 563 F.2d 692, 699–700 (5th Cir.1977). Most jurisdictions, including the Sixth Circuit, have followed the *"Mobile Steel* formulation." *United States v. Noland,* 517 U.S. at 538, 116 S.Ct. 1524; *In re Baker & Getty Financial Services, Inc.,* 974 F.2d 712, 717–18 (6th Cir.1992).

■ First Bank alleges in its complaint that North Country received funds that it knew or should have known First Bank was entitled to. Further, First Bank claims that North Country engaged in its postpetition relationship with the Debtor in order to change an unsecured debt into a secured one. *Assuming* that these allegations are true, First Bank has met the first two conditions of the *Mobile Steel* test. However, under § 1141(a) of the Bankruptcy Code, the order confirming the Debtor's chapter 11 plan has a binding effect on the parties to the bankruptcy. Since equitably subordinating North Country's claims to First Bank's claims would be inconsistent with that section of the Bankruptcy Code, First Bank cannot satisfy the third requirement of the Mobile Steel test.

■ The Sixth Circuit has consistently stated that a plan confirmed under § 1141(a) is entitled to a res judicata effect, i.e., "claim preclusion." *In re Pioneer Investment Services Co.,* 2 F.3d 1151, 1156 (6th Cir.1993); *Sanders Confectionery Products, Inc. v. Heller Financial, Inc.,* 973 F.2d 474, 480 (6th Cir.1992); *In re Chattanooga Wholesale Antiques, Inc.,* 930 F.2d 458 (6th Cir.1991). See, *Matter of Penrod,* 50 F.3d 459 (7th Cir.1995); *Armstrong v. Norwest Bank,* 964 F.2d 797 (8th Cir.1992); *In the Matter of Howe,* 913 F.2d 1138 (5th Cir.1990); *In re Troutman Enterprises, Inc.,* 253 B.R. 8 (6th Cir. BAP 2000); *Snyder v. United States,* 213 B.R. 321 (E.D.Mich.1997); *Holly's, Inc. v. City of Kentwood (In re Holly's, Inc.),* 178 B.R. 711, 714 (W.D.Mich.1995); *In re Monclova Care Center, Inc.,* 254 B.R. 167 (Bankr. N.D.Ohio 2000). See generally, Norton Bankruptcy Law & Practice 2d, § 95:1; Eric Richards, *Due Process Limitations on the Modification of Liens Through Bankruptcy Reorganization,* 71 Am. Bankr.L.J. 43, 58 (1997). In *Sanders Confectionery,* the Sixth Circuit set forth the four-part test to determine when a proceeding will be barred by the res judicata effect of an order confirming a plan:

1) A final judgment on the merits in the first action by a court of competent jurisdiction;

2) The second action involves the same parties, or their privies, as the first;

3) The second action raises an issue actually litigated or which should have been litigated in the first action;

4) An identity of the causes of action[.]

*Sanders Confectionery Products. Inc. v. Heller Financial, Inc.,* 973 F.2d at 480 (citations omitted). See generally, Ralph Avery, *Chapter 11 Bankruptcy and Principles of Res Judicata,* 102 Com.L.J. 257 (1997).

■ The first element is satisfied whenever a court of competent jurisdiction enters an order confirming a chapter 11 plan. "Confirmation of a plan of reorganization constitutes a final judgment in bankruptcy proceedings." *Sanders Confectionery Products, Inc. v. Heller Financial, Inc.,* 973 F.2d at 480 (citing *Stoll v. Gottlieb,* 305 U.S. 165, 59 S.Ct. 134, 83 L.Ed. 104 (1938)). Likewise, the second

element is easily satisfied in this adversary proceeding, because both First Bank and North Country actively participated in the bankruptcy proceedings.[6] The third and fourth elements, however, require some discussion.

■ The third element necessary for res judicata is that the second action raises an issue that was either actually litigated or which should have been litigated in the first action. The Sixth Circuit has held that claims by creditors that could have been brought within the context of the confirmation process are barred by res judicata. *Micro–Time Management Systems, Inc. v. Allard & Fish, P.C. (In re Micro–Time Management Systems, Inc.)*, 983 F.2d 1067 (Table), 1993 WL 7524 (6th Cir.1993);[7] *Sanders Confectionery Products, Inc. v. Heller Financial, Inc.*, 973 F.2d at 480. *Accord, D & K Properties v. Mutual Life Insurance Co. of NY*, 112 F.3d 257, 260 (7th Cir.1997).

First Bank is a sophisticated lending institution. It was given notice of, and participated in, the Debtor's bankruptcy case. First Bank failed to object to North Country's secured claim prior to confirmation. First Bank also failed to challenge the plan provision that mandated North Country was fully secured and would be treated as unimpaired.[8] First Bank even voted to accept the Second Amended Plan of Reorganization. North Country Exhibit H. The treatment of secured creditors and North Country's postpetition lending practices with the Debtor could have, and should have, been raised during the confir-

mation process. The third element necessary for res judicata is therefore present.

■ As to the fourth element, "[i]dentity of causes of action means an 'identity of the facts creating the right of action and of the evidence necessary to sustain each action.' " *Sanders Confectionery Products, Inc. v. Heller Financial, Inc.*, 973 F.2d at 484 (quoting *Westwood Chemical Co. v. Kulick*, 656 F.2d 1224, 1227 (6th Cir.1981)). First Bank's claim for equitable subordination hinges on the assertion that North Country gained an unfair advantage over First Bank through its dealings with the Debtor. In order to prove this assertion, First Bank would have to rely upon facts and evidence showing the details of North Country's relationship with the Debtor. This is the same evidence and facts that were necessary to establish North Country's claim in the bankruptcy proceeding. Thus, the fourth element necessary for res judicata is present.

While the Sixth Circuit has yet to decide the precise issue of whether § 1141(a) bars the postconfirmation remedy of equitable subordination, the Eleventh Circuit has held that equitable subordination is inappropriate after confirmation of a chapter 11 plan. *Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II, Ltd.)*, 898 F.2d 1544, 1550 (11th Cir.1990). The claims of equitable subordination and other claims that were, or could have been, litigated prior to confirmation were barred by res judicata. *Id.* at 1552 ("The . . . adversary complaint essentially brings an impermis-

---

6. "The basic premise of preclusion is that parties to a prior action are bound and nonparties are not bound." 18 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 4449 (2000 Supplement).

7. While *Micro–Time Management* is an unpublished opinion, it is increasingly cited as persuasive authority. *See, e.g., D & K Properties v. Mutual Life Insurance Co. of NY*, 112 F.3d at 260.

8. Article III of the Debtor's Second Amended Plan of Reorganization states:

3.2 There is one other creditor whose claims are unimpaired under this Plan of Reorganization as that term is defined by Section 1124 of the Bankruptcy Code, being the claim of the Class VII creditor, The North Country Bank and Trust. Its first claim is fully secured. . . . Its second claim is fully secured. . . . To the extent that these payments are insufficient to pay this claim in full at the expiration of said five year period, any remaining unpaid balance on principal accrued interest will be paid in full by the Debtor.

sible collateral attack on the order confirming the plan.").

*Justice Oaks* involved a limited partnership which owned a residential development in Florida. It filed a chapter 11 petition in May, 1996. After the debtor filed its plan, one of its creditors, the Wallises, who guaranteed the bank loan to the limited partnership, filed an adversary proceeding against the debtor and others. The Wallises alleged they were induced to guarantee the debtor's bank loan by fraud. The Wallises also requested equitable subordination of certain secured creditors' claims. While the adversary proceeding was pending, the bankruptcy court confirmed the debtor's chapter 11 plan over Wallises' objection. The adversary proceeding was subsequently dismissed by the bankruptcy court because all issues raised had already been considered by the court when it confirmed the plan. *Id.* at 1548.

Upon Wallises' appeal, the Eleventh Circuit reviewed the requirements of res judicata, i.e., claim preclusion. *Id.* at 1550. The court noted the Wallises, who participated in the confirmation process, were "parties" for claim preclusion purposes. *Id.* at 1551. Because the claims in the adversary proceeding were based upon the same claims covered by the confirmation process, the Eleventh Circuit held that res judicata prohibited the Wallises from continuing to assert the equitable subordination issue—claims that "were already raised, *or could have been raised*, in [Wallises'] objection to confirmation" were barred. *Id.* at 1552 (emphasis added).[9]

The Bankruptcy Court for the Northern District of Ohio likewise ruled that plan confirmation barred a subsequent claim for equitable subordination. *In the Matter of GEX Kentucky, Inc.,* 100 B.R. 887 (Bankr. N.D.Ohio 1988). In *GEX Kentucky,* the defendants were sister corporations of the debtor. The debtor's original plan allowed for the claims of the defendants to be subordinated to those of the other unsecured creditors. The defendants objected to this treatment, and a second amended plan was filed, treating the defendants as equal to all other general unsecured creditors. The second amended plan was approved and confirmed. After confirmation, the plaintiff filed a complaint seeking equitable subordination of the claims of the defendants. In holding that the order confirming the chapter 11 plan had a res judicata effect, the court noted that the plaintiff, as was the case in this adversary proceeding, failed to file an objection to the plan, and voted to accept it. *GEX Kentucky,* 100 B.R. at 888–89.

■■■ While not binding authority, this court agrees with *Justice Oaks* and *GEX Kentucky.* Those cases are persuasive, well-reasoned and consistent with prior Sixth Circuit decisions. This court holds that, unless a confirmed plan explicitly reserves the claim, equitable subordination may not be raised after confirmation of the plan. Such a postconfirmation claim is precluded by the res judicata effect of § 1141(a).

Because First Bank failed to raise any equitable subordination issues before confirmation, failed to reserve its rights to assert this remedy in the confirmed plan, and voted to accept the plan, First Bank is barred from seeking this remedy now.[10]

---

9. The Wallises, in *Justice Oaks*, asserted "it is now inequitable and unfair to propose that [the secured creditor] ... receive a substantial portion of the debt due them [sic], in light of the aforementioned inequitable conduct." *Id.* at 1552. This court notes that First Bank's assertion in this adversary proceeding is very similar to Wallises' assertion. One major difference is that the Wallises made their argument at confirmation; First Bank did not object to confirmation, voted in favor

of the plan, and first made its assertion after the plan was confirmed. It must be emphasized that First Bank could have raised North Country's alleged "inequitable conduct" before confirmation, but it failed to do so.

10. The confirmed plan permitted First Bank and other secured creditors to determine their respective priorities in the Debtor's collateral after confirmation. This limited reservation of rights does not permit First Bank to assert equitable subordination as a result of the al-

First Bank cannot prevail on this claim as a matter of law, and North Country is entitled to summary judgment as to First Bank's claim for equitable subordination.

■ First Bank's request to deny North Country super-priority status under § 364 as a result of North Country's failure to obtain court approval for its postpetition lending relationship with the Debtor is likewise barred by the res judicata effect of plan confirmation.[11] First Bank had ample opportunity to object to North Country's postpetition relationship with the Debtor during the confirmation process. First Bank voted in favor of plan confirmation, despite any misgivings it may have had about North Country's plan treatment as fully secured and unimpaired. It is now far too late for First Bank to object. North Country is therefore entitled to summary judgment as to any claim allegedly arising from North Country's postpetition, preconfirmation lending relationship with the Debtor.

## VII. CONCLUSION

First Bank is entitled to summary judgment as to its claim for declaratory judgment that it is the prepetition first-priority lienholder in the Debtor's new and used inventory, used automobile inventory, chattel paper, instruments, documents, accounts, general intangibles, contract rights and security agreements, and all noncash and *identifiable* cash proceeds from the sales of these prepetition assets. However, First Bank's security interest in cash proceeds is limited to those proceeds that can be traced to the sales of First Bank's collateral.

North Country is entitled to summary judgment as to First Bank's demand for a constructive trust, except as to the disputed collateral. Because there remains a

material disputed fact regarding the date of the Debtor's purchase or acquisition of the disputed collateral, neither party is entitled to summary judgment as to the disputed collateral.

North Country is entitled to summary judgment as to First Bank's request to modify the Debtor's confirmed chapter 11 plan.

North Country is entitled to summary judgment as to First Bank's claim for equitable subordination, as a result of the res judicata effect of plan confirmation. Likewise, North Country is entitled to summary judgment as to any action First Bank may have had against North Country which arose from North Country's postpetition lending relationship with the Debtor, including any action under § 364.

First Bank's Motion for Summary Judgment is therefore granted in part and denied in part. North Country's Motion for Summary Judgment is granted in part and denied in part. An order shall be entered accordingly.

---

leged wrongful misconduct by North Country. *See* Article VI of the Second Amended Plan of Reorganization.

11. Since the court holds that claim preclusion prevents First Bank from pursuing a claim

arising from North Country's postpetition lending practices with the Debtor, the court does not now need to address whether First Bank has standing to bring such a claim.